# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Sean Rodney Orth,<br><br>Petitioner<br><br>v.<br><br>Calvin Johnson,[1] et al.,<br><br>Respondents | Case No. 2:17-cv-02047-JAD-BNW<br><br>**Order Denying Petition for**<br>**Habeas Relief, Granting Motion to Strike**<br>***Pro Se* Motion, and Closing Case**<br><br>[ECF Nos. 57, 85, 86] |

Petitioner Sean Rodney Orth brings this counseled amended habeas corpus petition under 28 U.S.C. § 2254 to challenge his 2007 Nevada state-court convictions for robbery with the use of a deadly weapon, conspiracy to commit robbery with the use of a deadly weapon, and eluding a police officer.[2] Orth was sentenced as a habitual criminal to three concurrent terms of life with the possibility of parole after ten years.[3] In his amended petition, Orth alleges that the State suppressed evidence that a witness was an informant for the Federal Drug Enforcement Agency and evidence of a meeting between a witness and law enforcement; his appellate counsel failed to raise a claim of a violation of his right to present a defense and compulsory process of a witness, a claim that the state district court erred in restricting cross-examination, *Brady* claims, a claim that Nev. Rev. Stat. § 484.348 is unconstitutionally vague, and a claim that the state district court erred in failing to compel disclosure of police department policies; there was insufficient evidence to support his conviction for eluding; and the state district court erred in refusing to allow him to call witnesses to testify.[4] Having evaluated the merits of those claims, I

---

[1] The state corrections department's inmate-locator page states that Orth is incarcerated at High Desert State Prison. Calvin Johnson is the current warden for that facility. At the end of this order, I direct the clerk to substitute Calvin Johnson as a respondent for Respondent Warden High Desert State Prison under Federal Rule of Civil Procedure 25(d).

[2] ECF No. 27-9.

[3] *Id.*

[4] ECF No. 57.

1

find that habeas relief is not warranted, so I deny Orth's petition, deny him a certificate of appealability, and close this case.

## Background

**A.      The facts underlying Orth's convictions**[5]

On May 1, 2005, Orth told Shaelynn Lester, an acquaintance who was visiting a friend at the time, that his computer had been stolen and sold to Zach Zafranovich. Orth did not know Zafranovich, so he asked Lester, who knew where Zafranovich resided, to go to Zafranovich's residence to get the computer back. Lester agreed, and Orth gave Lester money to pay Zafranovich in return for the computer.

Lester went to Zafranovich's residence in Sparks, Nevada, around 10:00 p.m. Zafranovich let Lester into his residence and told Lester that Lonnie White had sold him a computer. Suspicious of the circumstances of Lester's late visit, Zafranovich exited his residence and observed a red Jeep parked on his street. Zafranovich and Lester, who had briefly stepped outside as well, returned to the inside of the residence. A few seconds later, the front door of the residence was kicked in and three masked men wearing sweatshirts and hats and wielding guns entered the residence. One of the men pointed a gun at Lester and told her to leave. Lester complied. The two other men pointed guns at Zafranovich.

Kristy Reynolds, Zafranovich's girlfriend who had seen Zafranovich speaking to Lester but had returned to a bedroom, ran to the entrance of the residence. Zafranovich fought the men, and while fighting with one of the men, Zafranovich knocked the man's mask partially off. That man, identified as Orth, grabbed the mask and stuck it in his back pocket. At one point, Orth punched Zafranovich and then grabbed him and threw him backwards into a hot tub. Zafranovich, who had been struck with the butt of a gun on his head, was bleeding badly and had large gashes on his head from the fight.

---

[5] These facts are taken from the trial transcripts. ECF Nos. 22-2, 22-3, 23-1, 23-2, 24-1, 24-2, 25-1, 25-2, 26-1, 26-2, 27-1. For simplicity's sake, I cite to these exhibits generally for this entire fact section. I make no credibility findings or other factual findings regarding the truth or falsity of this summary of the evidence from the state court. My summary is merely a backdrop to my consideration of the issues.

At Orth's direction, Zafranovich and Reynolds took Orth to a bedroom closet where a safe was located.  Orth ordered Zafranovich to open the safe.  That safe contained, *inter alia*, a gold ring with diamonds in it, two wedding rings, some marijuana, and a diamond necklace.  Orth pulled out the diamond necklace, but Reynolds knocked it out of his hand.  Orth then exited the home with the safe and Zafranovich's and Reynolds's cellular telephones.

Following the robbery, Lester returned to her friend's residence, and Orth and George Kelly showed up about 10 to 15 minutes later with a tan safe, indicating that "they got him."  A few days later, Orth left Lester a voicemail saying that she "better not have told the police anything."

Zafranovich and Reynolds identified Orth from photographic lineups.  And Kerry McKenzie, Orth's girlfriend at the time, testified that Orth told her that he committed the robbery with George Kelly and Bobby Dortch.  McKenzie also found a gold ring in Orth's belongings, but she flushed it down the toilet.

Four days after the robbery, a sergeant with the Reno Police Department observed Orth driving a white Jeep.  The sergeant followed Orth, intending to arrest him for the armed robbery, and notified detectives.  The sergeant used a police radio to request the assistance of two marked units.  At that point, Orth rapidly accelerated away from the sergeant.  Orth attempted to evade the sergeant and several other law enforcement officers by crossing a train track when the train crossing arms were down, speeding, making evasive maneuvers, and entering a casino parking garage.  Law enforcement eventually abandoned their pursuit for safety reasons and later found Orth's vehicle abandoned.

Law enforcement surveilled Orth and determined that he was staying with McKenzie at the City Center Motel.  On May 11, 2005, at 8:30 p.m., law enforcement officers were watching the motel and saw Orth (who had dyed his hair) leave the hotel room and enter McKenzie's vehicle.  Orth pulled out of the motel, and law enforcement officers, who had stopped in the middle of the street with their weapons drawn and their lights activated, ordered Orth to stop the vehicle.  Orth drove on the sidewalk and appeared to get stuck between a streetlight and a building.  Orth opened the driver's door and puts his hands up.  However, Orth then shut the

door, revved the engine, and broke free of the streetlight and building.  Orth continued driving while several law enforcement vehicles chased him.  During the pursuit, Orth ran a red light, sped, and drove on the wrong side of the road.  After a law enforcement officer shot one of the tires in Orth's vehicle, Orth hit an electrical box.  Orth exited the vehicle and started to run.  Officers pursued Orth on foot, eventually catching and arresting him.

**B.     Procedural history**

After a jury trial in which Orth represented himself with stand-by counsel, the state district court convicted Orth of robbery with the use of a deadly weapon, conspiracy to commit robbery with the use of a deadly weapon, and eluding a police officer.[6]  The state district court sentenced Orth as a habitual criminal to three concurrent terms of life with the possibility of parole after ten years.[7]  Orth appealed, and the Nevada Supreme Court affirmed.[8]  Orth then filed a state habeas petition, which was denied by the state district court and affirmed on appeal by the Nevada Supreme Court.[9]

Orth filed a *pro se* federal habeas petition and a counseled amended petition.[10]  The respondents moved to dismiss Orth's amended petition, and I denied the motion.[11]  The respondents answered the amended petition, and Orth replied.[12]

//

//

//

//

---

[6] ECF No. 27-9.

[7] *Id*.

[8] ECF No. 28-4.

[9] ECF Nos. 32-2, 32-8.

[10] ECF Nos. 6, 57.

[11] ECF Nos. 65, 73.

[12] ECF Nos. 83, 84.

**Discussion**

**A.   Legal standards**

   *1.      Review under the Antiterrorism and Effective Death Penalty Act (AEDPA)*

   If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[13]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[14]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[15]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[16]  The "objectively unreasonable" standard is difficult to satisfy;[17] "even 'clear error' will not suffice."[18]

   Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[19] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision

---

[13] 28 U.S.C. § 2254(d).

[14] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[15] *White v. Woodall*, 134 S. Ct. 1697, 1705–07 (2014).

[16] *Id.* at 1705–06 (emphasis in original).

[17] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[18] *Wood v. McDonald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

[19] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

"was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[20]   "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[21]   AEDPA "thus imposes a 'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[22]

       If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim *de novo*.[23]   The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[24] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[25]

       **2.       Standard for federal habeas review of an ineffective-assistance claim**

       The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[26]   Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[27]   In *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the

---

[20] *Id.* at 103.

[21] *Id.* at 101.

[22] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[23] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[24] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[25] 28 U.S.C. § 2254(e)(1).

[26] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[27] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).

6

1  particular case;[28] and (2) it is reasonably probable that, but for counsel's errors, the result of the

2  proceeding would have been different.[29]

3       "A reasonable probability is a probability sufficient to undermine confidence in the

4  outcome."[30]  Any review of the attorney's performance must be "highly deferential" and must

5  adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting

6  effects of hindsight.[31]  "The question is whether an attorney's representation amounted to

7  incompetence under prevailing professional norms, not whether it deviated from best practice or

8  most common custom."[32]  The burden is on the petitioner to overcome the presumption that

9  counsel made sound trial-strategy decisions.[33]

10       When the ineffective-assistance-of-counsel claim is based on appellate counsel's actions,

11  a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous

12  issues and to file a merits brief raising them" and then "that, but for his [appellate] counsel's

13  unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal."[34]

14  "[T]o determine whether appellate counsel's failure to raise [certain] claims was objectively

15  unreasonable and prejudicial, [the court] must first assess the merits of the underlying claims."[35]

16       If a state district court previously adjudicated the claim of ineffective assistance of

17  counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult.[36]

18  *Strickland* and § 2254(d) are highly deferential, and when the two apply in tandem, review is

19

20  [28] *Strickland*, 466 U.S. at 690.

21  [29] *Id.* at 694.

22  [30] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

23  [31] *Strickland*, 466 U.S. at 689.

24  [32] *Richter*, 562 U.S. at 104.

25  [33] *Id.*

26  [34] *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

27  [35] *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010).

28  [36] *See Richter*, 562 U.S. at 104–05

1   doubly so.[37]  "When § 2254(d) applies, the question is not whether counsel's actions were

2   reasonable [but] . . . whether there is any reasonable argument that counsel satisfied *Strickland*'s

3   deferential standard."[38]

4   **B.**   **Evaluating Orth's claims**

5       ***1.***      ***Ground 1—suppression of evidence***

6       In ground 1 of his amended petition, Orth alleges that his rights to due process and a fair

7   trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the State suppressed

8   exculpatory and material evidence (1) that Zafranovich was an informant for the Federal Drug

9   Enforcement Agency ("DEA") and (2) of a May 24, 2005, meeting between Zafranovich and

10  police officers.[39]

11          ***a.***      ***Background information***

12              ***i.***      ***DEA informant***

13      During his trial, which took place in January 2007, Orth cross-examined Zafranovich

14  about his previous convictions.[40]  Zafranovich testified that he had two convictions for controlled

15  substances.[41]  Orth asked Zafranovich if he recalled telling the police that he had worked for the

16  district attorney's office before.[42]  The prosecutor objected, and an unreported sidebar was

17  held.[43]  Orth asked Zafranovich if he had any relationships with the district attorney's office, and

18  Zafranovich responded in the negative.[44]  Orth then asked Zafranovich about any relationships

---

19  [37] *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal
20  quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme
21  Court's description of the standard as doubly deferential.").

22  [38] *Richter*, 562 U.S. at 105.

23  [39] *Id.* at 7–13.

24  [40] ECF No. 23-1 at 87–88.

25  [41] *Id.* at 88.

26  [42] *Id.*

27  [43] *Id.*

28  [44] *Id.*

8

he had with the police, and Zafranovich responded, "[y]eah, some, yeah."[45]  Orth asked, "what are they," but the prosecutor objected, resulting in another unreported sidebar.[46]  Later during redirect examination, the prosecutor asked Zafranovich if he had "any agreement with [the prosecutor] or any other district attorney to testify in this or any other case," and Zafranovich responded, "[n]o, no."[47]

At Orth's state post-conviction evidentiary hearing, Patrol Officer Daniel Larason with the Sparks Police Department testified that he had an encounter with Zafranovich on November 12, 2006, in which he observed Zafranovich engaging in a possible drug transaction.[48]  Officer Larason ended up seizing "somewhere in the neighborhood of four pounds of marijuana" and "approximately a quarter pound of methamphetamine" from Zafranovich.[49]  It was Officer Larason's "understanding" that "Zafranovich ended up working with - - it might have been the DEA task force or someone like that, to turn a bigger deal in order to help himself out with the prosecution."[50]  In addition to this 2006 case, Detective Sergeant Aaron Leary testified that Zafranovich cooperated with law enforcement in January 2003, after he was found in possession of some methamphetamine.[51]  In that case, there were no charges filed due to Zafranovich's cooperation.[52]

The prosecutor in Zafranovich's 2006 case, Megan Rachow, was unavailable at the time of Orth's state post-conviction evidentiary hearing.[53]  However, Michael Mahaffey, a Washoe

---

[45] *Id.*

[46] *Id.* at 88–89.

[47] ECF No. 23-2 at 32.

[48] ECF No. 58-1 at 15–17.

[49] *Id.* at 17, 25.

[50] *Id.* at 27.

[51] ECF No. 58-3 at 6, 15–17.

[52] *Id.* at 21.

[53] ECF No. 58-2 at 24.

County Deputy District Attorney, testified that he covered for Rachow in hearings on April 25, 2007, and July 13, 2007.[54]  Mahaffey testified that he took notes at those hearings, and one of those notes indicated that Zafranovich was going to testify in a federal case and that "the District Attorney's Office was going to consider it as being substantial assistance."[55]  Similarly, Cheryl Wilson, a Washoe County Deputy District Attorney, testified that she also covered for Rachow at a preliminary hearing on January 25, 2007.[56]  Wilson testified that she took some notes at that hearing that stated that, "[a]s a result of receiving information that [Zafranovich] appeared to be cooperating with law enforcement," which was confirmed by Zafranovich's defense attorney, "I agreed to continue the case against [Zafranovich] for a substantial period of time to . . . let him continue to work with and cooperate with law enforcement."[57]  Tammy Riggs, the prosecutor in Orth's case, testified that she did not offer Zafranovich any deals of leniency and that she was not "aware of any agreement between any police or government agency and Zafranovich at the time of Orth's trial."[58]

Orth testified at the state post-conviction evidentiary hearing that he and his stand-by trial counsel learned that Zafranovich had been arrested prior to Orth's trial.[59]  Orth requested disclosure of the details of Zafranovich's arrest, and the State filed a motion in limine to preclude him from impeaching Zafranovich with the arrest.[60]  A state district court judge "ordered for

---

[54] *Id.* at 6, 7.

[55] *Id.* at 8.

[56] *Id.* at 13, 16.

[57] *Id.* at 13, 20–21.

[58] *Id.* at 39–41.

[59] ECF No. 58-1 at 119, 122.

[60] *Id.* at 123.

[Orth] not to go into [Zafranovich's] arrest," and disclosure of the details of the arrest never occurred.[61] Orth later learned that Zafranovich "received a $2,000 fine and no jail time."[62]

Regarding timing, Orth testified that his trial commenced on January 8, 2007.[63] While the criminal complaint against Zafranovich in his 2006 case had been filed by the time Orth's trial started, Zafranovich's criminal information, amended criminal information, and judgment of conviction were filed after Orth's trial concluded.[64] Following Orth's trial but before his sentencing, Orth learned from a man named Francisco Buitrago, who was also housed at the county jail, that "Zafranovich had also set him up to some local agency and he was being indicted in federal court because of Zafranovich's cooperation."[65] Buitrago had been indicted prior to Orth's trial.[66]

### ii.   *May 24, 2005, meeting*

At Orth's trial, Detective Michael Brown with the Sparks Police Department testified that he met with Zafranovich on May 4, 2005.[67] Detective Brown also testified about a second meeting with Zafranovich in which Zafranovich presented various items "he'd received . . . from an unknown person who he refused to identify."[68] Detective Brown did not take the items presented to him by Zafranovich at that second meeting because "[t]here's no way [he] would be able to use it against the defendant, not being able to explain its origin or if it was even the legitimate stolen property from the initial report."[69]

---

[61] *Id.*

[62] *Id.* at 129.

[63] *Id.* at 131.

[64] *Id.*

[65] *Id.* at 132.

[66] *Id.* at 133.

[67] ECF No. 24-1 at 3.

[68] *Id.* at 17.

[69] *Id.*

Orth testified at his state post-conviction evidentiary hearing that he first learned of Detective Brown's second meeting with Zafranovich—the May 24, 2005, meeting—during Brown's testimony at his trial.[70]  If he had known about this meeting prior to trial, Orth testified, he "would have asked Mr. Zafranovich about it . . . through [his] cross-examination."[71] However, because Detective Brown testified after Zafranovich and Zafranovich refused to return during Orth's case-in-chief, Orth was unable to ask Zafranovich about the May 24, 2005, meeting.[72]

Similar to his trial testimony, Detective Brown testified at the post-conviction evidentiary hearing that he had two meetings with Zafranovich: one on May 4, 2005, and one on May 24, 2005.[73]  The May 24, 2005, meeting, which was short, was at the request of Zafranovich "[t]o release some property."[74]  Zafranovich offered Detective Brown the property, saying "he got it from the person that he refused to name."[75]  Detective Brown did not take this property into evidence because he did not "deem[ ] it to be worthy of booking into evidence at that time."[76]

### b.    *Standard for a Brady claim*

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution."[77]  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State,

---

[70] ECF No. 58-1 at 136.

[71] *Id.* at 142.

[72] *Id.*

[73] ECF No. 58-1 at 31, 46–47.

[74] *Id.* at 47, 54, 68.

[75] *Id.* at 52.

[76] *Id.*

[77] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

either willfully or inadvertently; and prejudice must have ensued."[78]  The materiality of the

evidence that has been suppressed is assessed to determine whether prejudice exists.[79]  Evidence

is material "if there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different."[80]  "The question is not whether

the defendant would more likely than not have received a different verdict with the evidence, but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy

of confidence."[81]  Accordingly, "[a] 'reasonable probability' of a different result is . . . shown

when the government's evidentiary suppression 'undermines confidence in the outcome of the

trial.'"[82]

### c.    *State court determination*

In affirming the denial of Orth's state habeas petition, the Nevada Supreme Court held

that the trial court properly found that there was no *Brady* violation because the evidence Orth

pointed to was not favorable:

> The record . . . shows that Z.Z. cooperated with law enforcement in an
> unrelated proceeding after Orth's trial concluded and that the cooperation had no
> connection with Orth's prosecution—such that Z.Z.'s cooperation could not have
> been disclosed prior to trial and could not have been used to impeach him. . . . [T]his
> *Brady* claim lacks merit, *see Mazzan v. Warden*, 116 Nev. 48, 66-67, 993 P.2d 25,
> 36-37 (2000) (applying *Brady* and explaining that the State must disclose material,
> favorable evidence to the defense, including evidence providing grounds to
> impeach the State's witnesses)[.]
>
>      . . .  After considering Detective Brown's testimony during the
> postconviction evidentiary hearing, the district court found that the evidence
> regarding the meeting [between Z.Z. and Detective Brown at a Scooper's
> restaurant] was not favorable because it did not impeach any witness and was not

---

[78] *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

[79] *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006).

[80] *United States v. Bagley*, 473 U.S. 667, 682 (1985).

[81] *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

[82] *Id.* (quoting *Bagley*, 473 U.S. at 678).

probative to any material issue. Those findings are entitled to deference. As the evidence was not favorable, this *Brady* claim lacks merit.[83]

Orth argues that the following facts found by the Nevada Supreme Court were unreasonable: "Z.Z. cooperated with law enforcement in an unrelated proceeding after Orth's trial concluded and that the cooperation had no connection with Orth's prosecution—such that Z.Z.'s cooperation could not have been disclosed prior to trial and could not have been used to impeach him."[84] This factual finding that Zafranovich cooperated with law enforcement after Orth's trial concluded was an unreasonable determination of fact. Although the criminal information, amended criminal information, and judgment of judgment were filed in Zafranovich's 2006 case after Orth's trial concluded, Detective Leary testified that Zafranovich also cooperated with law enforcement in January 2003, resulting in no charges being filed against Zafranovich. Orth also testified that he learned from a fellow inmate that Zafranovich had testified about his cooperation with a law enforcement agency at that fellow inmate's indictment before Orth's trial. Because the Nevada Supreme Court's decision was based on an unreasonable determination of the facts, I review this claim *de novo*.[85]

### d.    Analysis

Addressing the first *Brady* prong, I find that Zafranovich's cooperation with law enforcement and second meeting with police were potentially favorable to Orth as impeachment evidence. Zafranovich's cooperation with law enforcement in order to lessen his criminal charges in an unrelated matter could tend to undermine his credibility and reliability.[86] Similarly, Zafranovich's second meeting with police could also have tended to undermine

---

[83] ECF No. 32-8 at 4.

[84] ECF No. 84 at 19.

[85] *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires"); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that . . . the state court's decision was based on an unreasonable determination of the facts, we evaluate the claim de novo.").

[86] *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("As to the first *Brady* component (evidence favorable to the accused), beyond genuine debate, the suppressed evidence relevant here, Farr's paid informant status, qualifies as evidence advantageous to Banks.").

1  Zafranovich's credibility and reliability given the fact that Zafranovich set up the meeting in

2  order to hand over evidence but then refused to tell the officers where the evidence had come

3  from.

4            Turning to the second *Brady* prong, I find that Zafranovich's cooperation with law

5  enforcement was suppressed by the prosecution.  The prosecution did not provide Orth with any

6  information regarding Zafranovich's prior cooperation with law enforcement and objected when

7  Orth sought to cross examine Zafranovich about his relationship with law enforcement.

8  However, because Detective Brown, a prosecution witness, testified about Zafranovich's second

9  meeting with police at Orth's trial, I do not find that Zafranovich's second meeting with police

10  was necessarily suppressed.[87]  And because evidence of this second meeting was not presented

11  until after Zafranovich testified and because Zafranovich was unavailable when recalled such

12  that he could not be asked about this second meeting, I assess whether prejudice ensured from

13  this late disclosure.

14            Turning to the final *Brady* prong, I do not find that the suppression of Zafranovich's

15  cooperation with law enforcement in unrelated matters or Zafranovich's second meeting with

16  law enforcement prejudiced Orth.  Although this evidence may have undermined Zafranovich's

17  credibility and reliability, Zafranovich's credibility and reliability were already thoroughly

18  challenged at Orth's trial.  In fact, the state district court noted during the trial that "there's a

19  number of other things that affect - - seriously affect [Zafranovich's] credibility, and I think that

20  the jury has had an opportunity to see those."[88]  And importantly, Zafranovich was not especially

21  critical to the prosecution's case.[89]  Zafranovich's girlfriend, who was also present when the

22  ―――――――――――――――――
   [87] *See, e.g., United States v. Juvenile Male*, 864 F.2d 641, 647 (9th Cir. 1988) ("No violation
23  occurs if the evidence is disclosed to the defendant at a time when the disclosure remains of
   value.").

24  [88] ECF No. 27-1 at 20.

25  [89] *See Smith v. Cain*, 565 U.S. 73, 76 (2012) ("[O]bserv[ing] that evidence impeaching an
26  eyewitness may not be material if the State's other evidence is strong enough to sustain
   confidence in the verdict."); *cf. Banks v. Dretke*, 540 U.S. 668, 700–01 (2004) (holding that
27  impeachment evidence was material because it pertained to a witness whose testimony, which
   was "uncorroborated by any other witness," was "crucial to the prosecution"); *cf. Wearry v.
28  Cain*, 136 S. Ct. 1002, 1006–1007 (2016) (determining that there was a lack of confidence in the
   jury's verdict due to the suppression of evidence related to two witnesses' motivations for

robbery occurred, identified Orth following the robbery and testified about Orth's participation

in the robbery.  Lester, who had gone to Zafranovich's residence at Orth's insistence, testified

that Orth returned 10 to 15 minutes after the robbery with a tan safe and said, "they got him."

And McKenzie, Orth's girlfriend at the time of the robbery, testified that Orth confessed to her

that he committed the robbery.  Because Zafranovich's testimony was not critical to the

prosecution's case, confidence in the outcome of Orth's trial was not undermined by the

suppression of Zafranovich's cooperation with law enforcement and the State's late disclosure of

Zafranovich's second meeting with law enforcement.[90]  Accordingly, it cannot be concluded that

"there [was] a reasonable probability that, had the evidence [of Zafranovich's cooperation with

law enforcement and second meeting with law enforcement] been [timely] disclosed to the

defense, the result of the proceeding would have been different."[91]  Orth is denied federal habeas

relief for ground 1.

### 2.    Ground 2—effective assistance of appellate counsel

In ground 2, Orth alleges that his appellate counsel provided ineffective assistance of

counsel in violation of his Fifth, Sixth, and Fourteenth Amendment rights[92] by failing (a) to raise

the claim of a violation of his constitutional right to present a defense and compulsory process,

(b) to raise a claim that the state district court erred in restricting cross-examination of

Zafranovich in violation of the Confrontation Clause, (c) to raise *Brady* claims, (d) to raise a

---

testifying because "the only evidence directly tying [the defendant] to th[e] crime was [one
witness's] dubious testimony, corroborated by the similarly suspect testimony of [the other
witness]"); *cf. Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (finding suppressed evidence
material where tainted witness's testimony "was the centerpiece of the prosecution's case" and
"[n]early all of the other evidence against Hayes was circumstantial"); *cf. Silva v. Brown*, 416
F.3d 980, 987 (2005) ("Impeachment evidence is especially likely to be material when it
impugns the testimony of a witness who is critical to the prosecution's case.").

[90] *See Kyles*, 514 U.S. at 434.

[91] *Bagley*, 473 U.S. at 682.

[92] ECF No. 57 at 13.

16

claim that Nev. Rev. Stat. § 484.348 was unconstitutionally vague, and (e) to raise a claim that the state district court erred in failing to compel disclosure of Reno Police Department policies.[93]

### a.     Ground 2(a)—right to present a defense and compulsory process

In ground 2(a), Orth alleges that appellate counsel was ineffective for failing to raise a claim regarding a violation of his constitutional rights to present a defense and compulsory process of Zafranovich.[94]  Orth argues that he was not able to impeach Zafranovich with DNA evidence, with evidence of a second meeting with police officers, and with his untruthful testimony about winning money at a casino.[95]  Orth also argues the state district court refused to allow him to compel a police officer to testify and to read statements Zafranovich made to police.[96]

### i.     Background information

On May 4, 2004, Zafranovich was interviewed by the Sparks Police Department regarding the robbery.[97]  During that interview, Zafranovich told police that he had Orth's watch and it "[p]robably [has] his blood," meaning "[s]ome DNA."[98]

Zafranovich testified at Orth's trial on January 9 and 10, 2007, but he was not asked about the watch.[99]  During cross-examination, Zafranovich testified that he "told police that one of the motives to th[e] supposed robbery might be money that [he] won at the Atlantis

---

[93] *Id.* at 14–29.

[94] *Id.* at 14.

[95] *Id.*

[96] *Id.*

[97] ECF No. 29-3 at 1.

[98] *Id.* at 6.

[99] ECF Nos. 22-3 at 2; 23-1 at 46; 23-2 at 2.

Casino."[100]  Zafranovich testified that he won approximately $14,000 to $17,000 "around" May 1, 2005.[101]

Following his testimony, the state district court excused Zafranovich but informed him that he was "still under subpoena" and "may be re-called."[102]  Two days later Jeffrey Rolands, a DNA analyst for Washoe County Sheriff's Office Crime Laboratory, testified that he performed a DNA analysis on the watch that Zafranovich had given to the police.[103]  That DNA analysis showed that "Zafranovich [was] consistent with being the source of th[e] DNA profile."[104] Further, "George Kelly and Sean Orth [were] excluded as sources of the mixed DNA profile obtained from the watch swab."[105]

As was discussed in ground 1, following Zafranovich's testimony, Detective Brown testified about a second meeting he had with Zafranovich on May 24, 2005, in which Zafranovich presented various items "he'd received . . . from an unknown person who he refused to identify."[106]  Detective Brown did not take the items presented to him by Zafranovich at that second meeting because "[t]here's no way [he] would be able to use it against the defendant, not being able to explain its origin or if it was even the legitimate stolen property from the initial report."[107]  As was also discussed in ground 1, Orth did not learn about this second meeting until his trial.  Detective Brown also testified that he had a meeting with Zafranovich on May 4, 2005, and at that meeting, Zafranovich gave him a watch.[108]

---

[100] ECF No. 23-1 at 98.

[101] *Id.* at 98–99.

[102] ECF No. 23-2 at 51.

[103] ECF No. 26-1 at 95, 96, 106.

[104] *Id.* at 106.

[105] *Id.*

[106] ECF No. 24-1 at 17.

[107] *Id.*

[108] *Id.* at 3, 33.

Orth called Sean Douglas Simpson, the director of security and risk management for the Atlantis Casino.[109]  Simpson testified that Zafranovich won $1,500 on May 1, 2005, at 2:53 a.m.[110]

On January 16, 2007, Orth called Zafranovich during his case-in-chief, but, following some discussion off the record, it was stated that "Zafranovich had a surgery yesterday" and was not present.[111]  The trial court instructed Orth to get "as much information as possible with regard to where he is, what his circumstances are, so the Court can decide what, if anything, needs to be done about his unavailability, if it turns out that he is unavailable."[112]  The district court also asked for (1) "input from both sides from the standpoint of any citation to legal authority, statutory, regulatory, or case law that might deal with an issue where a defense witness has been subpoenaed and, for some reason, cannot appear," and (2) "an offer of proof from the defense as to what it's believed the areas of questioning of Mr. Zafranovich would have been."[113]  In preparation for Zafranovich's potential absence the following day, the state district court noted that it was "still not understanding what remedy [Orth] would be asking for" and instructed Orth to "be thinking about what remedy [he] might request and what the authority for that remedy would be."[114]

The next day—the final day of the trial—the prosecutor informed the trial judge that Zafranovich informed a detective that "he [was] in too much pain" to come to court and "understands that he is subject to a warrant for his arrest."[115]  The prosecutor noted that Orth "was informed that the surgery was going to happen" and then argued that Orth's remedy in this

---

[109] ECF No. 26-2 at 119.

[110] *Id.* at 119–120.

[111] *Id.* at 92.

[112] *Id.* at 90.

[113] *Id.*

[114] *Id.* at 136.

[115] ECF No. 27-1 at 14.

situation, which the prosecutor argued was unnecessary because there was no prejudice, was to "ask for a material witness warrant and a continuance."[116]  In response, Orth simply rebutted the prosecutor's prejudice argument by noting, *inter alia*, that he was not able to impeach Zafranovich with the DNA evidence from the watch because Rolands had not yet testified.[117] Orth then stated, "I need to confront Mr. Zafranovich. . . . I think that in a case like this where a person changes his story all the time, that it is very relevant for me to be able to look at Mr. Zafranovich in front of the jury and point all the other things that I have found that will just completely make him discredited in front of the jury."[118]

The state district court noted, *inter alia*, that (1) the Atlantis winnings were not material because they occurred the day prior to the robbery, (2) "the testimony of the people from the crime lab . . . impeach[es] what Mr. Zafranovich may have said," (3) Zafranovich had already been impeached by "a number of other things that . . . seriously affect his credibility," (4) it is not material to the defense to recall Zafranovich, and (5) "there is a certain risk in not cross-examining when the opportunity is there."[119]  Orth requested that he be able to "read some points out of Mr. Zafranovich's recorded statement to police and a few pieces out of the transcripts."[120] The state district court allowed Orth to read portions of Zafranovich's prior testimony, but it refused to allow Orth to read portions of Zafranovich's police interview on hearsay grounds.[121] Zafranovich asked if he could recall a police officer from Zafranovich's police interview to ask about Zafranovich's statements regarding the watch.[122]  The state district court indicated that (1) it was "not going to hold this jury up to try to get witnesses here," (2) if Orth could "get them

---

[116] *Id.* at 16.

[117] *Id.* at 19.

[118] *Id.* at 19–20.

[119] *Id.* at 20.

[120] *Id.* at 21.

[121] *Id.* at 25–26.

[122] *Id.* at 26.

here, [he could] go ahead and read the testimony," (3) "this was a problem that should have been anticipated on the basis of the problem . . . yesterday," and (4) Orth could argue the inconsistencies in closing argument.[123]  Orth responded, "[o]kay," and the state district court asked Orth if he was "ready for the jury."[124]  Orth responded in the affirmative.[125]

After the jury was brought into the courtroom, Orth informed them that Zafranovich was again not present and, "instead of continuing this any further, we've decided to allow me to read some pieces out of his prior testimony in place of his absence."[126]  Orth then read Zafranovich's previous testimony, which provided, *inter alia*, that he had won the money at the Atlantis "[t]he day before" the robbery, "[a]nd then the following night is when it happened."[127]  When asked if Orth had "any other evidence [he] want[ed] to offer," Orth responded, "we don't want to delay the proceedings any further.  We have no further evidence, Your Honor.  We'll argue it in closing."[128]    At the post-conviction evidentiary hearing, Orth's appellate counsel testified that "it would have been proper to raise the issue of Mr. Zafranovich's unavailability to testify or his unwillingness to testify under a compulsory process" claim.[129]

### ii.    State court determination

In affirming the denial of Orth's state habeas petition, the Nevada Supreme Court found Orth's compulsory-process claim and related denial-of-defense claim without merit:

> Orth argued that appellate counsel should have asserted a compulsory process violation when Z.Z. did not return to testify when recalled. As Orth cross-examined Z.Z. extensively, had notice of Z.Z.'s scheduled medical procedure that brought about his unavailability, and did not move to compel Z.Z.'s appearance or

---

[123] *Id.* at 27.

[124] *Id.* at 28.

[125] *Id.*

[126] *Id.* at 29.

[127] *Id.* at 31.

[128] *Id.* at 38.

[129] ECF No. 58-1 at 202.

to obtain a continuance to arrange his appearance, Orth's compulsory process claim lacks merit.

[FN3] The trial court permitted Orth to read into the record Z.Z.'s prior statements, and Orth only sought to return to matters already addressed in Z.Z.'s prior testimony.

*See Palmer v. State*, 112 Nev. 763, 766, 920 P.2d 112, 113 (1996) (explaining that defendant's right to compel production of witnesses is not absolute); *Collins v. State*, 88 Nev. 9, 13-14, 492 P.2d 991, 993 (1972) (concluding that trial court did not abuse its discretion in disallowing recross-examination where defendant had already thoroughly questioned the witness). As appellate counsel is not required to raise meritless issues and the omitted issue would not have had a reasonable probability of success on appeal, we conclude that Orth has not shown that appellate counsel was ineffective. The district court therefore did not err in denying this claim.[130]

### iii.    Analysis

The Compulsory Process Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."[131]  A criminal defendant cannot establish a violation of his compulsory process right unless he "make[s] some plausible showing" of how the potential witness's "testimony would have been both material and favorable to his defense."[132]  So "when determining whether a violation of a criminal defendant's right to compulsory process has occurred, we ask 'two questions: (1) whether the trial court's *refusal* to allow [the defendant] to call [witnesses in his favor] was an arbitrary denial and (2) whether [those witnesses] . . . could have presented testimony that would have been *relevant and material* to the defense."[133]  Evidence is material "only if there is a reasonable likelihood that the testimony could have

---

[130] ECF No. 32-8 at 6–7.

[131] U.S. Const. amend VI.

[132] *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).

[133] *Selam v. Warm Springs Tribal Corr. Facility*, 134 F.3d 949, 952 (9th Cir. 1998) (emphasis in original).

22

affected the judgment of the trier of fact."[134]  Evidence that is merely cumulative to the testimony of other available witnesses is not material.[135]

Relatedly, the Constitution also "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"[136]  And "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies."[137]

The Nevada Supreme Court reasonably determined that Orth's compulsory-process claim and related denial-of-defense claim lacked merit because Orth never acted to compel Zafranovich's or any police officer's appearances or to obtain a continuance to arrange for those appearances.  Indeed, the state district court instructed Orth to explain the remedy he desired following Zafranovich's lack of appearance, the state district court told Orth that he could read Zafranovich's police interview statement if he could get the officers there, and the prosecution noted that Orth's remedy would be to ask for a material-witness warrant and a continuance.  But Orth never asked for a material witness warrant for Zafranovich, did not contact any police officers in advance of the final day of trial even though it was anticipated that Zafranovich was not likely to appear on recall, never asked the state district court for the opportunity to contact any police officers on the final day of trial to see if they were available to testify on short notice, and never requested a continuance.  Instead, it appears that Orth abandoned seeking the further testimonies of Zafranovich or a police officer.  After reading Zafranovich's prior testimony to the jury, and when asked by the state district court whether he had "any other evidence [he] want[ed] to offer," Orth said that he did not "want to delay the proceedings any further," he had "no further evidence" to offer, and he would argue it—meaning the remaining inconsistencies in

---

[134] *Valenzuela-Bernal*, 458 U.S. at 874.

[135] *Id.* at 873.

[136] *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

[137] *Washington v. Texas*, 388 U.S. 14, 19 (1967).

Zafranovich's testimony—during closing arguments.  Thus, Orth did not take the affirmative steps necessary to invoke his right to compulsory process of Zafranovich or any police officer,[138] so there was no refusal by the state district court to allow Orth to call these witnesses.

Further, Orth fails to demonstrate that recalling Zafranovich or a police officer to introduce Zafranovich's police-interview statement would have been material to his defense. Rather, these testimonies would have been cumulative because Zafranovich had already been impeached by the inconsistencies that Orth sought to highlight: (1) Detective Brown testified that Zafranovich had given him a watch at their first meeting but evidence showed that Orth was excluded as the source of DNA on that watch; (2) Detective Brown testified that he met with Zafranovich a second time and, during that meeting, Zafranovich presented various items "from an unknown person who he refused to identify," and Detective Brown declined to take the items because he could not determine whether the property was even legitimately stolen; and (3) Zafranovich testified that he won approximately $14,000 to $17,000 at the Atlantis Casino on May 1, 2005, but the director of security and risk management for the Atlantis Casino testified that Zafranovich won just $1,500 that day.[139]

Accordingly, the Nevada Supreme Court reasonably determined that Orth's underlying compulsory-process and denial-of-defense claims lacked merit.  Orth thus fails to demonstrate that he would have prevailed on appeal had his appellate counsel included these same underlying claims in his direct appeal.[140]  Because the Nevada Supreme Court's determination constituted

---

[138] *See, e.g., Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (explaining that the availability of the right to compulsory process "is dependent entirely on the defendant's initiative," which "requires that its effective use be preceded by deliberate planning and affirmative conduct"); *Osborne v. Johnston*, 120 F.2d 947, 949 (9th Cir. 1941) (concluding that there was "no basis for the conclusion that [the appellant] was deprived of his right to [compulsory] process" because "appellant did not, by his motion or otherwise, request compulsory process for obtaining witnesses").

[139] Orth appears to argue that he would have been able to impeach Zafranovich regarding the timing of winning the money at the Atlantis Casino.  However, the director of security and risk management for Atlantis testified that Zafranovich won the money at 2:53 a.m. on May 1, 2005, which is consistent with Zafranovich's testimony that he won the money prior to the robbery, which took place around 10:00 p.m. that day.

[140] *Smith*, 528 U.S. at 285.

1  an objectively reasonable applicable of federal law and was not based on an unreasonable

2  determination of the facts,[141] Orth is not entitled to federal habeas relief for ground 2(a).

3              *b.     Ground 2(b)—restricting cross-examination*

4        In ground 2(b), Orth alleges that appellate counsel was ineffective for failing to raise a

5  claim that the state district court violated the Confrontation Clause by restricting his opportunity

6  to question Zafranovich about his relationships with law enforcement.  Orth argues that, had he

7  been given that chance, Zafranovich may have revealed that he was cooperating with law

8  enforcement during the time of the trial.[142]

9              *i.     Background information*

10        As was discussed in ground 1, Orth asked Zafranovich on cross-examination if he

11  recalled telling the police that he had worked for the district attorney's office before.[143]  The

12  prosecutor objected, and an unreported sidebar was held.[144]  Orth asked Zafranovich if he had

13  any relationships with the district attorney's office, and Zafranovich responded in the

14  negative.[145]  Orth then asked Zafranovich about any relationships he had with the police, and

15  Zafranovich responded, "[y]eah, some, yeah."[146]  Orth asked, "what are they," but the prosecutor

16  objected, resulting in another unreported sidebar.[147]  Orth moved on in his line of questioning.[148]

17        At Orth's post-conviction evidentiary hearing, Orth's appellate counsel testified that she

18  did not bring any issue on appeal "regarding any restriction of Mr. Orth's ability to cross-

19

20

---

21  [141] *Strickland*, 466 U.S. at 690, 694; *Smith*, 528 U.S. at 285.

22  [142] *Id.* at 19.

23  [143] ECF No. 23-1 at 88.

24  [144] *Id.*

25  [145] *Id.*

26  [146] *Id.*

27  [147] *Id.* at 88–89.

28  [148] *Id.* at 89.

examine Mr. Zafranovich."[149]  Orth's appellate counsel testified that "if there was an issue, . . .

it's not clear in the record,"[150] And counsel clarified that, "[i]f there was no . . . record outside

the presence of the jury revealing the contents of the sidebar, . . . that [would] affect [her]

decision to claim that there was some error at the sidebar" because she needs to support "every

claim with references to the record."[151]

### ii.        *State court determination*

In affirming the denial of Orth's state habeas petition, the Nevada Supreme Court found

that Orth did not meet his burden:

> Orth argued that appellate counsel should have asserted that the district
> court erred in restricting Orth's cross-examination of Z.Z. when it limited Orth's
> inquiry into Z.Z.'s arrest and relationships with police and the district attorney.
> While Z.Z.'s prior felony convictions were addressed at trial, his arrest shortly
> before trial was not a proper ground of impeachment. *See Bushnell v. State*, 95 Nev.
> 570, 572, 599 P.2d 1038, 1039-40 (1979). Orth also did not identify facts that might
> have colored Z.Z.'s testimony that he was prevented from eliciting and thus did not
> identify an abuse of discretion by the trial court that appellate counsel should have
> challenged. *See id.* at 572, 599 P.3d at 1040. Accordingly, we conclude that Orth
> failed to show that appellate counsel was deficient in omitting this claim or that he
> suffered prejudice. The district court therefore did not err in denying this claim.[152]

Orth argues that the Nevada Supreme Court's determination that he "did not identify

facts that might have colored Z.Z.'s testimony that he was prevented from eliciting" was an

unreasonable determination of fact, so I should review this ground *de novo*.[153]  It appears that the

Nevada Supreme Court's finding that Orth did not identify specific facts that would have

distorted Zafranovich's testimony is linked to its earlier determination—discussed in ground 1—

that Zafranovich only cooperated with law enforcement in an unrelated proceeding after Orth's

trial concluded.  I have already found this determination of fact to be unreasonable.  So, for the

---

[149] ECF No. 31-1 at 35.

[150] *Id.*

[151] *Id.* at 79.

[152] ECF No. 32-8 at 9.

[153] ECF No. 84 at 36.

1   reasons discussed in ground 1, I find that the Nevada Supreme Court's decision on this ground

2   was also based on an unreasonable determination of the facts, and I thus review this ground *de*

3   *novo*.[154]

4           *iii.*      *Analysis*

5         But a *de novo* review fails to result in habeas relief for Orth. The Sixth Amendment's

6   Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . .

7   . to be confronted with the witnesses against him."[155] "[A] primary interest secured by [the

8   Confrontation Clause] is the right of cross-examination."[156] While "the Confrontation Clause

9   guarantees an opportunity for effective cross-examination," it does not guarantee "cross-

10   examination that is effective in whatever way, and to whatever extent, the defense might

11   wish."[157] "A criminal defendant states a violation of the Confrontation Clause by showing that

12   he was prohibited from engaging in otherwise appropriate cross-examination designed to show a

13   prototypical form of bias on the part of the witness."[158]

14         Orth fails to state a violation of the Confrontation Clause because he has not shown that

15   he was prohibited from engaging in cross-examination of Zafranovich. Indeed, the record is not

16   clear what was said at the sidebars. This was the basis of Orth's appellate counsel's decision not

17   to include a Confrontation Clause claim in Orth's appeal. This decision was reasonable, so Orth

18

---

19   [154] *See Panetti*, 551 U.S. at 948; *Hurles*, 752 F.3d at 778.

20   [155] U.S. Const. amend. VI.

21   [156] *Douglas v. Alabama*, 380 U.S. 415, 418 (1965); *see also Maryland v. Craig*, 497 U.S. 836,
22   845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the
      evidence against a criminal defendant by subjecting it to rigorous testing in the context of an
      adversary proceeding before the trier of fact."); *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985)
23   ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair
      opportunity to probe and expose . . . infirmities through cross-examination, thereby calling to the
24   attention of the factfinder the reasons for giving scant weight to the witness' testimony."); *Davis
      v. Alaska*, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the
25   believability of a witness and the truth of his testimony are tested.").

26   [157] *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted); *see
      also Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) ("[T]he Confrontation Clause's functional
27   purpose i[s] ensuring a defendant an opportunity for cross-examination.").

28   [158] *Van Arsdall*, 475 U.S. at 680.

fails to demonstrate that his appellate counsel acted deficiently.[159]  Orth is therefore not entitled to federal habeas relief for ground 2(b).

### c.    Ground 2(c)—Brady

In ground 2(c), Orth alleges that appellate counsel was ineffective for failing to raise two *Brady* claims: (1) the State suppressed evidence that Zafranovich was an informant for the DEA, and (2) the State suppressed evidence of the May 24, 2005, meeting between Zafranovich and police officers.[160]

### i.    State court determination

In affirming the denial of Orth's state habeas petition, the Nevada Supreme Court held:

> Second, Orth argued that appellate counsel should have asserted that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding impeachment information regarding . . . Z.Z.'s cooperation with law enforcement. The record . . . shows that Z.Z. cooperated with law enforcement in an unrelated proceeding after Orth's trial concluded and that the cooperation had no connection with Orth's prosecution—such that Z.Z.'s cooperation could not have been disclosed prior to trial and could not have been used to impeach him. Because this *Brady* claim lacks merit, *see Mazzan v. Warden*, 116 Nev. 48, 66-67, 993 P.2d 25, 36-37 (2000) (applying *Brady* and explaining that the State must disclose material, favorable evidence to the defense, including evidence providing grounds to impeach the State's witnesses), we conclude that Orth failed to show that appellate counsel's omission of this claim was deficient or that he suffered prejudice. The district court therefore did not err in denying this claim.

> Third, Orth argued that appellate counsel should have asserted that the State violated *Brady* by withholding evidence of a meeting between Z.Z. and Detective Brown at a Scooper's restaurant. After considering Detective Brown's testimony during the postconviction evidentiary hearing, the district court found that the evidence regarding the meeting was not favorable because it did not impeach any witness and was not probative to any material issue. Those findings are entitled to deference. As the evidence was not favorable, this *Brady* claim lacks merit. Accordingly, we conclude that Orth did not show that appellate counsel's failure to raise this meritless claim was deficient or that he suffered prejudice. The district court therefore did not err in denying this claim.[161]

---

[159] *Strickland*, 466 U.S. at 690; *Smith*, 528 U.S. at 285; *see also Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (explaining that the burden of rebutting the presumption that trial counsel acted reasonably rests on the defendant); *Jones v. Barnes*, 463 U.S. 745, 753 (1983) ("A brief that raises every colorable issue runs the risk of burying good arguments.").

[160] ECF No. 57 at 21, 25.

[161] ECF No. 32-8 at 3–4.

1

2     *ii.*        ***Analysis***

3          For the same reasons addressed in ground 1, I review this ground *de novo*.  And for the

4     same reasons addressed in ground 1, I find that Orth's underlying *Brady* claims lack merit.

5     Therefore, Orth's appellate counsel was not deficient for excluding them from Orth's appeal.[162]

6     Orth is denied federal habeas relief for ground 2(c).

7     **d.        Ground 2(d)—unconstitutionally vague statute**

8          In ground 2(d), Orth alleges that appellate counsel was ineffective for failing to raise a

9     claim that Nev. Rev. Stat. § 484.348 was unconstitutionally vague.  because the statute does not

10    define what a "readily identifiable police vehicle" means.[163] As is discussed further in ground 3,

11    at the time of Orth's trial, Nev. Rev. Stat. § 484.348(1) defined eluding as "willfully fail[ing] or

12    refus[ing] to bring the vehicle to a stop, or . . . flee[ing] or attempt[ing] to elude a peace officer in

13    a readily identifiable vehicle of any police department or regulatory agency, when given a signal

14    to bring the vehicle to a stop."[164]

15    **i.        Background information**

16         During his trial, outside the presence of the jury, Orth discussed the vagueness of

17    Nevada's eluding statute.[165]   The state district court disagreed with his characterization:

> The statute, I think - - the statute does not define readily identifiable. And I
> think that whether a vehicle is readily identifiable as a police vehicle depends upon
> all the facts and circumstances of the situation. And I do not think that the
> Legislature intended that only a marked police vehicle could institute a pursuit.
>
> I think the question is whether or not a reasonable person would have been
> able to determine that this was a police vehicle. I think red lights and sirens are a
> pretty good indication that it was a police vehicle, and I think that's sufficient.
>
> I don't think there is any other requirement specifically or any other part of
> the statute that says red light and siren is not enough to make it readily identifiable.
> If the Legislature had intended that, I think they would have said it, and they didn't.

---

[162] *Smith*, 528 U.S. at 285.

[163] ECF No. 57 at 26.

[164] Nev. Rev. Stat. § 484.348(1) has been substituted by Nev. Rev. Stat. § 484B.550(1).

[165] ECF No. 24-2 at 11.

So I interpret the statute to mean that if the jury decides that this vehicle was readily identifiable as a police vehicle, then that's what they decide.

And I don't think that the police are restricted to only pursue folks in black and white marked vehicles, but I think it's well known the police use plain undercover vehicles. And the fact that they're equipped with red lights and siren, I think - - and those are on, I think that's sufficient to satisfy the statute.

. . . I don't think the statute is ambiguous at all. I think the statute leaves the issue of what is readily identifiable, because I think you can imagine a number of scenarios where a vehicle would be readily identifiable as a police vehicle, yet not be a marked vehicle.[166]

Later, after researching the legislative history of the statute, the state district court explained:

I see nothing in that legislative history that requires that a vehicle be a marked vehicle before it's a readily identifiable vehicle - - a readily identifiable emergency vehicle.

I would also note that in the same section the Legislature, the Legislature dealt with NRS 484.787, which authorizes a number of types of vehicles to operate as emergency vehicles. And some of those include privately owned vehicles which are obviously unmarked, and they may be used in the pursuit of actual or suspected violators of the law.

And in order to do that, to be able to be operated as an authorized emergency vehicle, it must display a flashing red light and sound an automobile siren.

It's the Court's conclusion that the Legislature enacted these two statutes at the same time during the same legislative session, that if they had any intent to require that the vehicle have the kind of marking that is being claimed that is required, the Legislature would have included that in the statute.

So I feel confident in the interpretation that the readily identifiable vehicle depends upon all the facts and circumstances of the case, including the demeanor, the appearance, the uniforms, the equipment, all the other things that the occupants of that vehicle may have, the facts and circumstances and what the person who would be observing the vehicle would have reasonably had in his or her mind based upon all the facts and circumstances, including knowledge that the police may or may not be interested in that particular person.[167]

At Orth's post-conviction evidentiary hearing, his appellate counsel testified that she did not raise a claim regarding the vagueness of Nev. Rev. Stat. § 484.348; she "just raised the issue

---

[166] *Id.* at 12–13.

[167] *Id.* at 153–54.

of whether there was sufficient evidence for the charge of eluding."[168]   Orth's appellate counsel

testified that she "probably didn't think that [the statute] was unconstitutionally vague," so it was

a tactical decision to focus on the sufficiency claim rather than a vagueness claim.[169]

### ii.        State court determination

In affirming the denial of Orth's state habeas petition, the Nevada Supreme Court held

that the statute is not vague:

> Fourteenth, Orth argued that appellate counsel should have argued that NRS
> 484.348 (now codified as NRS 484B.550) was vague because it did not define
> "readily identifiable vehicle." Having considered the two tests for vagueness, *see
> State v. Castaneda*, 126 Nev. 478, 481-82, 245 P.3d 550, 553 (2010), we conclude
> that the statute is not vague.  Because this challenge lacks merit, Orth failed to show
> that appellate counsel was deficient in omitting this claim or that he suffered
> prejudice.  The district court therefore did not err in denying this claim.[170]

### iii.        Analysis

"[T]he Government violates [due process of law] by taking away someone's life, liberty,

or property under a criminal law so vague that it fails to give ordinary people fair notice of the

conduct it punishes, or so standardless that it invites arbitrary enforcement."[171]   The Nevada

Supreme Court reasonably determined that Nev. Rev. Stat. § 484.348 is not unconstitutionally

vague under this standard.[172]   So the Nevada Supreme Court reasonably determined that Orth's

underlying claim lacked merit.  Due to this determination, Orth fails to demonstrate that he

---

[168] ECF No. 31-1 at 46.

[169] *Id.* at 47, 51.

[170] ECF No. 32-8 at 10.

[171] *Johnson v. United States*, 135 S.Ct. 2551, 2556 (2015); *see also Giaccio v. Pennsylvania*, 382
U.S. 399, 402–03 (1966) ("It is established that a law fails to meet the requirements of the Due
Process Clause if it is so vague and standardless that it leaves the public uncertain as to the
conduct it prohibits or leaves judges and jurors free to decide, without any legal fixed standards,
what is prohibited and what is not in each particular case.").

[172] *See* ECF No. 32-8 at 10 (citing *State v. Castaneda*, 245 P.3d 550, 553 (2010) (explaining that
"'[v]agueness may invalidate a criminal law for either of two independent reasons': (1) if it 'fails
to provide a person of ordinary intelligence fair notice of what is prohibited'; or (2) if it 'is so
standardless that it authorizes or encourages seriously discriminatory enforcement.'" (internal
citation omitted))).

would have prevailed on appeal had his appellate counsel included this same underlying claim in his direct appeal.[173]

Furthermore, Orth's appellate counsel testified that it was a tactical decision to focus on a sufficiency-of-the-evidence claim regarding Orth's eluding conviction instead of a vagueness challenge to the eluding statute. This strategic decision is "virtually unchallengeable."[174]

Thus, the Nevada Supreme Court's determination constituted an objectively reasonable applicable of *Strickland*'s performance and prejudice prongs and was not based on an unreasonable determination of the facts.[175] Orth is not entitled to federal habeas relief for ground 2(d).

### e.   Ground 2(e)—disclosure of policies

In ground 2(e), Orth alleges that appellate counsel was ineffective for failing to raise a claim that the state district court erred in failing to compel disclosure of Reno Police Department policies.[176] Orth explains that he could have used these policies to show that the officers' testimonies at trial were tailored to conform to the Reno Police Department policies rather than to the actual events that took place when he was pursued by officers in unmarked vehicles.[177]

### i.   Background information

Prior to trial, Orth subpoenaed the Reno Police Department's policy regarding vehicle pursuits.[178] During a pre-trial motions hearing, in an attempt to quash Orth's subpoena, the prosecution provided the state district court "a copy of the Reno Police Department's Policy and

---

[173] *Smith*, 528 U.S. at 285.

[174] *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *see also Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic decisions.").

[175] *Strickland*, 466 U.S. at 690, 694; *Smith*, 528 U.S. at 285.

[176] ECF No. 57 at 28.

[177] *Id*.

[178] ECF No. 31-1 at 58.

Procedures Manual for the Court's en camera review."[179]  The state district court granted the prosecution's motion to quash Orth's subpoena after "balanc[ing] the interests of the defendant against the need to avoid public knowledge of the preferred method of conducting pursuits."[180]

At Orth's post-conviction evidentiary hearing, his appellate counsel testified that she did not include the quashing of the subpoena for the Reno Police Department's policy in Orth's appeal because an objection to the quashing of the subpoena was not renewed at trial, so she "assume[d] that that's a tactical reason by counsel not to pursue" the issue further.[181]  There was testimony at the post-conviction evidentiary hearing that the Reno Police Department's policy, as applicable here, "outlines how [officers] should conduct themselves in relation to vehicle pursuits."[182]  If officers do not follow the policy, then they "may be subject to an Internal Affairs review to see if [they] acted outside the scope of that general order."[183]

In denying Orth's state habeas petition, the state district court explained that the written policies would only have supported—rather than contradicted—pre-trial testimony that it was the policy of the Reno Police Department to turn over pursuits to marked vehicles, so Orth's contention that the written policy "would somehow have altered the outcome of the trial[ ] is ridiculous."[184]  Indeed, at Orth's trial, Officer Reed Thomas testified that he "had briefly checked [his] rearview mirror to see if we had marked units with us, and I wasn't sure that we had any close enough that could take over the pursuit."[185]

---

[179] ECF No. 21-20 at 4.

[180] ECF No. 32-2 at 11.

[181] ECF No. 31-1 at 58–59.

[182] *Id.* at 116.

[183] *Id.* at 117.

[184] ECF No. 32-2 at 11.

[185] ECF No. 25-2 at 70.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#### ii.        *State court determination*

In affirming the denial of Orth's state habeas petition, the Nevada Supreme Court held

that this claim lacked merit:

> Sixteenth, Orth argued that appellate counsel should have argued that the
> trial court erred in rejecting his motion to compel disclosure of Reno Police
> Department policies on vehicular pursuits. As the balance of interests in this case
> weighs heavily against disclosure, *see Donrey of Nev., Inc. v. Bradshaw*, 106 Nev.
> 630, 635-36, 798 P.2d 144, 147-48 (1990) (explaining that when a defendant moves
> for production of a public record, the court must balance the law enforcement
> interest in nondisclosure with the general policy in favor of open access to
> government records), we conclude that the underlying claim lacks merit.
> Accordingly, Orth did not show that appellate counsel was deficient in omitting this
> claim or that he suffered prejudice.  The district court did not err in denying this
> claim.[186]

#### iii.        *Analysis*

As the Nevada Supreme Court, the final arbiter of Nevada law, reasonably concluded,

Nevada law, which requires a balancing of interests, weighed against disclosure of the Reno

Police Department policies.  So the Nevada Supreme Court reasonably determined that Orth's

underlying claim attacking the lack of disclosure of the policy lacked merit.  Due to this

determination, Orth fails to demonstrate that he would have prevailed on appeal had his appellate

counsel included this same underlying claim in his direct appeal.[187]

Orth also fails to demonstrate that, even if his underlying claim regarding the lack of

disclosure of the policy had merit, he would have prevailed on appeal.  The disclosure of the

police policy, which would have confirmed that unmarked police vehicles should give way to

marked police vehicles during a pursuit, corresponded with Officer Thomas's trial testimony that

he did not give way to marked police vehicles during his pursuit of Orth because he did not see

any close enough.  Consequently, the policy would not have impeached any testimony.

Accordingly, the Nevada Supreme Court's determination constituted an objectively reasonable

---

[186] ECF No. 32-8 at 10–11.

[187] *Smith*, 528 U.S. at 285.

applicable of *Strickland*'s prejudice prong and was not based on an unreasonable determination of the facts.[188]  Orth is not entitled to federal habeas relief for ground 2(e).

### 3.    *Ground 3—sufficiency of the evidence*

In ground 3, Orth alleges that the State failed to present sufficient evidence for felony eluding, violating his Fifth and Fourteenth Amendment rights.[189]  He bases this theory on the absence of marked police vehicles in the area when the order to arrest him was made, and he argues that he did not know that the unmarked vehicles were police vehicles.[190]

Orth asserts that this ground should be reviewed *de novo* because the Nevada Supreme Court did not specifically address it.[191]  But the United States Supreme Court held in *Harrington v. Richter* that, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[192]  This is precisely what happened here.  The Nevada Supreme Court indicated that it had "also considered Orth's remaining arguments" and "conclude[d] that Orth's arguments on appeal lack merit."[193]  So I presume under *Richter* that the Nevada Supreme Court adjudicated Orth's instant claim on the merits.  And because Orth fails to adequately rebut that presumption, *de novo* review is not appropriate.  Instead I "determine what arguments or theories supported or . . . could have supported, the state court's decision."[194]

---

[188] *Strickland*, 466 U.S. at 694; *Smith*, 528 U.S. at 285.

[189] ECF No. 57 at 29.

[190] *Id.*

[191] ECF No. 84 at 44.

[192] *See Richter*, 562 U.S. at 99 (emphasis added)); *see also Johnson v. Williams*, 568 U.S. 289, 293 (2013) ("[W]hen a state court issues an order that summarily rejects without discussion *all* the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." (emphasis in original)).

[193] ECF No. 28-4 at 18–19.

[194] *Richter*, 562 U.S. at 102; *Carter v. Davis*, 946 F.3d 489, 502 (9th Cir. 2019).

### a. Legal standard

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[195] A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."[196] On direct review of a sufficiency-of-the-evidence claim, a state court must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[197] The evidence is to be viewed "in the light most favorable to the prosecution."[198] Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of the law.[199]

### b. State law

Sufficiency of the evidence claims are judged by the elements defined by state law.[200] Nevada law defines eluding as "willfully fail[ing] or refus[ing] to bring the vehicle to a stop, or . . . flee[ing] or attempt[ing] to elude a peace officer in a readily identifiable vehicle of any police department or regulatory agency, when given a signal to bring the vehicle to a stop."[201] Eluding becomes a felony if the driver "[i]s the proximate cause of damage to the property of any other person" or "[o]perates the motor vehicle in a manner which endangers or is likely to endanger any other person or the property of any other person."[202]

[195] *In re Winship*, 397 U.S. 358, 364 (1970).

[196] *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

[197] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

[198] *Id.*

[199] *See Juan H.*, 408 F.3d at 1275 n.13.

[200] *Jackson*, 443 U.S. at 324 n.16.

[201] Nev. Rev. Stat. § 484.348(1).

[202] Nev. Rev. Stat. § 484.348(3).

### c.    Background information

Detective Ken Harmon with the Reno Police Department testified that, on May 11, 2005, at approximately 8:00 p.m., police were surveilling the City Center Motel on West Street.[203] Detectives Harmon and Lever observed Orth come down the motel stairs, so they "dr[o]ve down the alley and then pull[ed] into the West Street" with "visor lights on, red and blue."[204]  The detectives parked their vehicle on West Street "kind of blocking the south of the driveway" and exited their vehicle, both wearing their "police raid vests," and Detective Harmon wearing a hat that said "police."[205]  Orth drove his vehicle out of the motel parking lot onto a sidewalk and got "wedged between the light standard and the building of the City Center Motel itself."[206]  The detectives had their "weapons drawn and were ordering Mr. Orth to stop the car."[207]  Detective Harmon testified that he made eye contact with Orth and it was his impression that Orth saw him.[208]  Orth opened the vehicle's door, turned, and looked at the detectives with his hands up.[209] Orth then shut the vehicle door, scraped by the light pole until he broke free, and continued driving on the sidewalk.[210]  Other police units pursued Orth with lights and sirens through several downtown streets.[211]  Orth eventually crashed into an electric box, exited his vehicle, and started to run.[212]

---

[203] *Id.* at 148–49.

[204] *Id.* at 150.

[205] *Id.* at 150–151.

[206] *Id.* at 151.

[207] *Id.*

[208] ECF No. 25-1 at 3.

[209] *Id.* at 5.

[210] *Id.* at 6.

[211] *Id.* at 86–87; *see also* ECF No. 25-2 at 43–46.

[212] ECF No. 25-2 at 54.

1

2

3      **d.     Analysis**

4      Orth argues that there were no marked police vehicles in the area when the order to arrest

5 him was made.  While this may have been true, his follow-up argument that he did not know that

6 the unmarked vehicles contained police officers is belied by the record.  Detectives Harmon and

7 Lever had their red and blue visor lights activated at the time Orth exited the motel.  And when

8 Orth got stuck between the light pole and the building, the detectives, who had exited their

9 vehicle, were wearing police vests, had their weapons drawn, and were ordering Orth to stop his

10 vehicle.  Orth made eye contact with the detectives and put his hands up as if to surrender before

11 driving away at a high rate of speed.  At that point, other police units pursued Orth with their

12 lights and sirens activated.  Viewing this evidence "in the light most favorable to the

13 prosecution,"[213] any rational trier of fact could have found that the police vehicles were "readily

14 identifiable vehicle[s] of a[ ] police department"[214] such that there was sufficient evidence

15 supporting Orth's eluding conviction.  So the Nevada Supreme Court's denial of relief

16 constitutes an objectively reasonable application of clearly established federal law and was not

17 based on an unreasonable determination of the facts.[215]  Orth is not entitled to federal habeas

18 relief for ground 3.

**4.     Ground 4—Confrontation Clause**

In ground 4, Orth alleges that his Sixth Amendment right under the Confrontation Clause

was violated when the trial court refused to allow him to call witnesses to testify.[216]  Related to

ground 2(a), Orth argues that he was denied the right to confront Zafranovich by recalling him to

impeach him with (1) DNA evidence, (2) evidence of a second meeting with police officers, and

(3) his untruthful testimony about winning money at a casino.[217]

---

[213] *Jackson*, 443 U.S. at 319.

[214] Nev. Rev. Stat. § 484.348(1).

[215] *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; Nev. Rev. Stat. § 484.348(1).

[216] ECF No. 57 at 30.

[217] *Id.* at 31.

### a.    State court determination

In affirming Orth's judgment of conviction, the Nevada Supreme Court held that Orth's

confrontation right was satisfied by his extensive in-court cross examination of Zafranovich:

> Orth argues that he should have been able to cross-examine Zafranovich after his accident. In this, Orth claims that he was prejudiced by his inability to question Zafranovich about the fact that the watch Zafranovich claims was stolen did not actually have Orth's DNA on it, and a recent trip that Zafranovich made to the Atlantis Casino. Orth claims that he had a constitutional right to have Zafranovich testify because Zafranovich was still under subpoena and Orth had discovered new evidence during trial. Orth further maintains that the evidence about which he wanted to examine Zafranovich would have proven that Zafranovich lied about Orth beating him and that Zafranovich never won money at the Atlantis Casino. As a result, Orth asserts that he was deprived of his Sixth Amendment right to confront Zafranovich about the events in question and about an alleged motive for the robbery.
>
> The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."
>
> [FN30] U.S. Const. amend. VI.
>
> The Confrontation Clause generally guarantees a defendant a face-to-face confrontation with witnesses testifying against him at trial and "ensures the reliability of the evidence by allowing the trier of fact to observe the demeanor, nervousness, expressions, and other body language of the witness."
>
> [FN31] *United States v. Hamilton*, 107 F.3d 499, 503 (7th Cir. 1997).
>
> We conclude Orth's contention that he was denied his Confrontation Clause rights lacks merit. Orth was permitted to confront Zafranovich face-to-face in court by way of extensive cross-examination. We accordingly conclude that Orth's basic Confrontation Clause rights were satisfied. In addition, we conclude that Orth's claims that he should have been able to recall Zafranovich lack merit because (1) Orth previously asked witnesses about the watch and the trip to the Atlantis Casino, (2) testimony about the watch and Atlantis Casino winnings were not material to Orth's defense, and (3) the district court permitted Orth to read Zafranovich's testimony into evidence in order to impeach him.[218]

### b.    Analysis

"The Sixth Amendment guarantees a defendant the right 'to be confronted with the

witnesses *against him*.'"[219]   As the Nevada Supreme Court reasonably determined, Orth was able

---

[218] ECF No. 28-4 at 15–16.

[219] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 314 (2009) (emphasis in original).

1   to confront Zafranovich by way of extensive cross-examination.[220]  Orth argues that this cross-

2   examination was insufficient to confront Zafranovich because he was not able to recall

3   Zafranovich during his case-in-chief.  The Nevada Supreme Court rejected this argument.

4         It is not clear that such a situation implicates the Confrontation Clause.  "The main and

5   essential purpose of confrontation is to secure for the opponent the opportunity of cross-

6   examination."[221]  Here, Orth would not have been the opponent and would not have been cross

7   examining Zafranovich; rather, he would have been presenting Zafranovich's testimony during

8   his case-in-chief and asking questions on direct examination.  Additionally, Zafranovich would

9   not necessarily been a witness against Orth at that point in the trial, rather than one in his favor.

10  And while the text of the Sixth Amendment provides that witness against the defendant must be

11  produced by the prosecution, it only provides that "the defendant *may* call" witnesses in his

12  favor.[222]  Finally, to the extent that recalling Zafranovich could be considered further cross-

13  examination, it cannot be concluded that the additional questioning of Zafranovich—about the

14  watch, the second meeting with law enforcement, and the casino winnings—would have

15  materially enhanced the effectiveness of Orth's prior impeachment of Zafranovich.[223]  Indeed, as

16  was discussed in ground 1, the state district court noted that Zafranovich had already been

17  extensively impeached[224] and, as was discussed in ground 2(a), Zafranovich was already further

18  impeached by these new inconsistencies through other evidence and testimony.  So the Nevada

19  Supreme Court's denial of Orth's Confrontation Clause claim constitutes an objectively

20

21  [220] ECF Nos. 23-1 at 87–137; 23-2 at 8–31, 42–44, 46–49.

22  [221] *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974).

23  [222] *Melendez-Diaz*, 557 U.S. at 314 (emphasis in original).

24  [223] *See Gibbs v. Covello*, 996 F.3d 596, 605–06 (9th Cir. 2021) (concluding that "fair-minded
    jurists could come to the conclusion reached by the California Court of Appeals, . . . that [the
25  petitioner] 'had an adequate opportunity to cross-examine [the witness]'" because further
    questioning of the witness "would not have materially enhanced the effectiveness of the cross-
26  examination").

27  [224] The state district court noted during the trial, "I also think there's a number of other things
    that affect - - seriously affect [Zafranovich's] credibility, and I think that the jury has had an
28  opportunity to see those."  ECF No. 27-1 at 20.

1   reasonable application of clearly established federal law and was not based on an unreasonable
2   determination of the facts.  Orth is not entitled to federal habeas relief on ground 4.

3   **C.      Petitioner's *pro se* motion to supplement**

4          Orth, acting *pro se*, moved to supplement his counseled reply brief.[225]  "It is well
5   established that district courts have inherent power to control their docket," including the power
6   to strike improperly filed items from the docket.[226]  Petitioner filed his *pro se* motion in violation
7   of LR IA 11-6, which provides that

8          A party who has appeared by attorney cannot while so represented appear or act in
        the case.  This means that once an attorney makes an appearance on behalf of a
9          party, that party may not personally file a document with the court; all filings must
        thereafter be made by the attorney.[227]
10

11  This rule further states that an "attorney who has appeared for a party must be recognized by the
12  court and all the parties as having control of the client's case."[228]  Because counsel has been
13  appointed to represent Orth, he may not file motions with the court.  So I strike his *pro se* motion
14  to supplement and do not consider its merits.

15  **D.      Certificate of Appealability**

16         The right to appeal from the district court's denial of a federal habeas petition requires a
17  certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial
18  showing of the denial of a constitutional right."[229]  "Where a district court has rejected the
19  constitutional claims on the merits," that showing "is straightforward: The petitioner must
20  demonstrate that reasonable jurists would find the district court's assessment of the constitutional

21
22
23
24  [225] ECF No. 85.

25  [226] *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010).

26  [227] LR IA 11-6(a).

27  [228] *Id.*

28  [229] 28 U.S.C. § 2253(c).

claims debatable or wrong."[230]  Because I have rejected Orth's constitutional claims on their merits, and he has not shown that this assessment of these claims is debatable or wrong, I find that a certificate of appealability is unwarranted for this case and I decline to issue one.

## Conclusion[231]

IT IS THEREFORE ORDERED that the petition **[ECF No. 57] is DENIED**, and because reasonably jurists would not find my decision to deny this petition to be debatable or wrong, a **certificate of appealability is DENIED**.

IT IS FURTHER ORDERED that the respondents' motion to strike **[ECF No. 86] is GRANTED.**  Orth's *pro se* motion **[ECF No. 85] is STRUCK**.

The Clerk of Court is directed to SUBSTITUTE Calvin Johnson for Respondent Warden High Desert State Prison, ENTER JUDGMENT accordingly, and CLOSE THIS CASE.

Dated: September 1, 2022

_____
U.S. District Judge Jennifer A. Dorsey

---

[230] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

[231] Orth requests that I conduct an evidentiary hearing.  ECF No. 57 at 34.  But Orth fails to explain what evidence would be presented at an evidentiary hearing.  Furthermore, I have already determined that Orth is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect my reasons for denying relief.  *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").  Thus, Orth's request for an evidentiary hearing is denied.